# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 17-cr-00381-2 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| MELVIN WATSON ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Melvin Watson is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The firearms at issue were discovered in the trunk of a car in which Watson was a passenger after the vehicle was pulled over by Chicago Police Department officers who suspected that shots had been fired from that car minutes earlier. Watson has moved to suppress the firearms and other evidence derived from the vehicle stop. (Dkt. No. 65.) An evidentiary hearing was held before this Court on June 8, 2018. For the reasons explained below, the Court denies the motion to suppress.

## BACKGROUND

At the evidentiary hearing, three Chicago Police Department officers, including the two arresting officers, testified in support of the Government. In addition, the search of the stopped vehicle was documented in police dashboard camera recordings. Those recordings were introduced as exhibits, along with transcripts of the accompanying audio. The Government also introduced video taken from a police observation device ("POD") camera set up near the area where the gunshots were thought to have been fired, and five photographs and a map of the area where Watson was pulled over. In addition to the Government's evidence, Watson testified on his own behalf. The following summarizes the substance of the evidence adduced at the hearing.

##### I. The Officers' Testimony

At the evidentiary hearing, the Court viewed evidence and heard testimony from Officers Mari Medina, Regan Allen, and Daniel Vasquez, setting forth the following sequence of events.

On September 6, 2016, Officers Medina and Allen, who worked out of the Chicago Police Department's Third District, were on patrol during the day shift. Shortly after 5:00 p.m., the officers returned to the Third District police station. As they were walking from their vehicle to go inside the station, they heard ten gun shots coming from the west. Officer Medina suspected that the gunshots came from the area around East 71st Street and South Rhodes Avenue. The officers returned to their vehicle, and Officer Medina radioed dispatch to report that she heard ten loud gunshots in the area of 71st and Rhodes. Officers Medina and Allen then drove in that direction. While they were driving, the officers heard over the police radio that there had been several calls reporting gunshots in the area of 71st and Rhodes. It took the officers approximately one minute to travel the half-mile from the police station to that intersection.

A POD camera[1] set up at 71st and Rhodes recorded video from around the time shots were fired. Near the beginning of the video, a vehicle that Officer Medina identified as occupied by her and Officer Allen can be seen patrolling the area. Four minutes later, a white Cadillac appears and turns to head south on Rhodes. Seconds after the vehicle disappears from the frame, pedestrians previously engaged in conversation suddenly begin running in different directions. Another individual enters the frame, running north on Rhodes—away from the direction that the white vehicle headed seconds earlier. Just over a minute later, at the bottom of the frame, Officer Medina and Allen's vehicle can be seen heading west on 71st and then turning south onto Rhodes.

---

[1] A POD camera is a video surveillance camera issued by the Chicago Police Department that is usually placed in high-crime areas.

Officer Allen testified that upon arriving at 71st and Rhodes, he first saw a man he recognized as a gang member. Officer Allen attempted to ask that man about the shooting, but the man was uncooperative. An older male then flagged Officers Allen and Medina down and told them that the shots came from a white Cadillac DTS with a white front grill with two males inside. The unidentified man said that the Cadillac had gone west of Rhodes towards South Eberhart Avenue. Officer Medina relayed that information over the radio and then proceeded to travel south on Rhodes and then west on 72nd Street. The officers turned north on Eberhart, at which point Officer Medina observed a white Cadillac crossing the intersection of 71st and Eberhart going northbound. In her testimony, Officer Medina estimated that approximately two minutes passed between the time she heard the gunshots and when she first saw the white Cadillac.

Officer Allen radioed the Cadillac's license plate. Then the officers pulled up behind the Cadillac and activated their lights and siren. However, according to the officers, the Cadillac did not yield. The officers continued to follow the Cadillac from behind at a vehicle-length distance. Although the Cadillac was not responding to the officers' lights and siren, the car was driving at a normal speed and did not commit any traffic violations. As they were following the Cadillac, the officers were able to confirm that the vehicle matched the description that the unidentified man gave them. While the Cadillac had tinted windows, it was still daylight on a sunny day and the officers had an unobscured view into the interior of the car. Officer Medina testified that she observed a passenger in the backseat who was ducking and moving to his left side and looking back at her. It appeared to her that the backseat passenger was attempting to hide something. Similarly, Officer Allen testified that the rear passenger appeared to be "busy at work with the rear-seat" and "pulling or pushing." The Cadillac continued travelling north on Eberhart and then

made a left at South Anthony Avenue, travelling in a northwesterly direction. Both officers maintained visual contact with the vehicle throughout their pursuit. They did not observe any passenger enter or exit the vehicle during this time.

While Officers Medina and Allen were investigating the shots and then pursuing the Cadillac, other officers were updated on the situation over the police radio. The officers who provided backup for Officers Medina and Allen drove two separate marked police vehicles, both equipped with dashboard cameras that also recorded audio.[2] Audio was captured through a microphone in an officer's vest, which picked up ambient sound including live voices and police radio transmissions. The audio from the police radio transmissions could also be heard by Officers Medina and Allen. The dashboard camera videos from the backup officers' cars and the accompanying audio feeds (and transcripts) were introduced at the evidentiary hearing. Officers Vasquez and Matthew Coffey were in one vehicle and first heard dispatch alert that it had received 911 calls reporting that "they're shooting in the alley and down the block on 72 and Rhodes." (Gov. Ex. Tr. 1 at 1:30–31.) Then Officer Allen's voice came over the radio reporting "Cadillac front grill DTS westbound from 71st, 72nd and Rhodes." (*Id.* at 2:2–3.) (Officer Medina explained during her testimony at the hearing that Officer Allen was relaying the tip from the unidentified man.) After the white Cadillac was pulled over, dispatch reported that a citizen called in and reported that the shots came from a white car. A second officer who had arrived on the scene at 71st and Rhodes also radioed in that "[t]hey're saying it was a . . . . [w]hite Cadillac, white front grill, that's the offenders." (*Id.* at 6:3–6.)

Eventually the white Cadillac stopped at 361 East 68th Street, just west of the intersection of 68th and Anthony. Backup had not yet arrived, and Officers Medina and Allen were the only

---

[2] Neither Officer Medina nor Officer Allen was wearing a body camera that day, and they were driving an unmarked vehicle that was not equipped with a dashboard camera.

officers on the scene. Officer Medina approached the vehicle on the passenger's side with her weapon drawn. As she approached, she observed an individual in the backseat who was later identified as Defendant Watson. In the driver's seat was a second individual, who Officer Allen recognized from past encounters as Alfred Withers, a ranking member of the DOD faction of the Black Disciples gang.[3] No other individuals were observed in the car. Officer Medina then ordered Watson to step out of the car. Watson complied. At the same time, Officer Allen approached the driver's side and removed Withers from the vehicle.

Around the time that Watson and Withers were being removed from the car, backup arrived. Officers Coffey and Vasquez arrived first, followed shortly thereafter by two other unidentified officers. After exiting the vehicle, Watson was promptly handcuffed. Officer Medina testified that Watson was handcuffed so that she could investigate the vehicle further without risk of Watson interfering with potential evidence. She also testified that she had safety concerns that justified handcuffing Watson, as the officers believed that the shots they had heard earlier came from inside the white Cadillac. In addition, Officer Allen testified that Withers's gang affiliation and previous involvement in violent encounters gave the officers further safety concerns. However, Officer Medina did not tell Watson that he was under arrest and did not read him his *Miranda* rights. Once Watson was handcuffed, Officer Medina handed Watson off to Officer Vasquez, who had joined her on the passenger's side of the vehicle. Officer Vasquez then took Watson to the side of Officers Medina and Allen's vehicle. Withers was also handcuffed and taken to the side.

Meanwhile, Officers Medina and Coffey searched the white Cadillac. In so doing, Officer Medina put her entire body inside the backseat of the vehicle. There, according to her testimony,

---

[3] Watson was not known to be affiliated with the Black Disciples or any other gang.

she observed that the armrest was down and there was an opening that allowed her to see into the trunk. In the trunk, she saw that the carpet was slightly up and the butt of a handgun was visible.[4] One of the officers opened the trunk and Officer Coffey proceeded to inspect it. Inside the trunk he discovered two handguns and a spent shell casing. The guns were not plainly visible to Officer Coffey; rather, they were hidden underneath a carpet. Officer Coffey then told Officer Medina that they "[g]ot two burners in the trunk"—meaning handguns. (*Id.* at 7:18.) He further reported that the guns were "accessible to the back seat." (*Id.* at 7:22.) Officer Coffey then walked over to Officer Allen and informed him that there were two guns in the backseat. Officer Allen replied "and we saw the guy in the backseat, so they're under arrest." (*Id.* at 8:13–14.)

According to Officer Allen's testimony, it was only at this point that he considered Watson to be under arrest. Officer Medina agreed that this was her understanding as well. She testified that they decided to arrest Watson based on the shots fired, the tip from the unidentified man about the shots coming from a white Cadillac occupied by two males, the failure of the car to yield once the officers activated their lights, and the discovery of the handguns and the spent shell casing.

Shortly after the officers discovered the guns, but before he was informed that he was under arrest, Watson attempted to flee—still handcuffed. While his attempted escape was not captured by either dashboard camera, audio from one of the cameras recorded the officers saying "Hey, he's running!" (*Id.* at 8:32–33.) Officers Allen and Coffey chased after Watson, but Officer Medina stayed behind to make sure that the guns and spent shell casing were secure. Officer

---

[4] An incident report drafted by Officer Allen following the events at issue did not relate that Officer Medina first observed the butt of a handgun through an opening in the backseat. Officer Medina testified that this omission was a mistake.

6

Coffey was quickly able to chase down Watson. Following his apprehension, Watson was returned to the area where the white Cadillac was stopped and placed in a secure police vehicle.

Officer Allen briefly returned to 71st and Rhodes and attempted to find the unidentified man that provided the tip regarding the source of the gunshots. Unable to find the man or any other evidence, Officer Allen returned to the scene. Following his arrest, Watson was taken to the Third District police station and underwent a gunshot residue test. He tested positive.

### II.     Watson's Testimony

As noted above, Watson also testified on his own behalf at the evidentiary hearing.

Watson testified that on the morning of September 6, 2016, he met up with Withers to help with Withers's lawn-mowing service. Withers picked Watson up at a gas station in a van that he used for his business. Later in the day, Withers and Watson switched from the van to the white Cadillac DTS.

Watson recalled hearing the same gunshots that Officers Medina and Allen heard. At the time he heard the shots, Watson was in a phone store at the corner of 71st and Vernon. Watson had gone to the store with Withers, and Withers had parked the white Cadillac nearby. At some point Withers left the store. Withers told Watson that he was going to an undisclosed location two blocks over. After Withers left, Watson remained in the phone store talking to an unidentified young woman. Upon hearing the gunshots, Watson exited the store and began walking east. He eventually ran into Withers, who was in the white Cadillac and talking to two or three individuals outside of the car at 71st and Eberhart. The car was stopped in the middle of Eberhart facing north. Withers told Watson to get in the car and Watson complied, sitting down in the back seat. Withers then rolled up the car's windows, turned on music, and began driving. They were at 70th and Eberhart when, according to Watson, they first encountered a marked police car headed

7

eastbound. The police car had its lights on but passed the white Cadillac and did not attempt to pull it over. After passing the police car, Withers turned left and proceeded down Anthony Avenue. Watson recalled first hearing a police siren just before the intersection of Anthony and 68th Street. Once the siren was activated, Watson testified that Withers turned onto 68th Street and pulled over once he felt it was safe to do so. Watson stated that during the entire trip he never once looked behind him, and therefore never made eye contact with the police car that stopped the white Cadillac or anyone in it. He also denied making any movements in the backseat of the car.

According to Watson, after the white Cadillac came to a stop, the officers approached the vehicle with their guns drawn and ordered Withers and Watson to step out. Both complied. Upon leaving the vehicle, they were promptly handcuffed by the officers. Watson testified that a female officer handcuffed him and he was taken away from the white Cadillac to stand in front of one of the police cars while the officers searched the white Cadillac. However, no officer had yet told Watson that he was under arrest. From his vantage point, Watson was able to watch the officers search the passenger compartment of the car, then open the trunk and search it as well. He never saw the officers remove anything from the trunk. After the search was completed, Watson took off running away from the officers.

## DISCUSSION

The indictment in this case charges both Watson and Withers with the offense of possessing a firearm having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (Dkt. No. 1.) Initially, Withers moved in writing to suppress the evidence seized and discovered incident to the purportedly illegal vehicle stop, and Watson joined that motion orally. (*See* Dkt. Nos. 52, 54.) However, Withers and the Government subsequently reached a plea agreement in connection with

a different matter, *United States v. Davis*, No. 1:13-cr-00063-2, pursuant to which the Government has agreed to dismiss the charges against Withers in this case. With Withers's motion to suppress having been effectively mooted, Watson was given an opportunity to file a written supplement to his own motion to suppress to ensure that any issues unique to him were preserved and addressed. (Dkt. No. 65.) Watson's supplemental filing also incorporates by reference the arguments and legal analysis in Withers's motion to suppress.

I. **The Vehicle Stop**

Under the Fourth Amendment to the United States Constitution, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons.'" *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Thus, a warrantless investigatory stop of a vehicle by law enforcement must meet the reasonableness requirements of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979). Specifically, law enforcement must have an articulable and reasonable suspicion that the motorist has broken the law. *See id.* at 663; *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018). Moreover, during such an investigatory stop, not only is the motorist seized for Fourth Amendment purposes, but so are any passengers. *Brendlin v. California*, 551 U.S. 249, 256–58 (2007). Consequently, a passenger has standing to challenge the constitutionality of the stop and may therefore bring a motion to suppress evidence derived from an unlawful stop. *Id.*; *Rodriguez-Escalera*, 884 F.3d at 667.

Here, Watson's primary argument against the legality of the vehicle stop is that Officer Medina and Officer Allen's sole basis for pulling over the white Cadillac was the tip of an anonymous informant. The reasonable-suspicion standard requires law enforcement to "be able to point to specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant" the stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Whether reasonable suspicion justifies an investigatory stop is "dependent upon both the content of information possessed by police and its degree of reliability." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014). In determining whether the standard is satisfied, the totality of the circumstances must be considered. *Id.* A "mere 'hunch'" does not suffice, but "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of evidence' and 'obviously less' than is necessary for probable cause." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

As an initial matter, the Court finds the testimony of Officers Medina, Allen, and Vasquez to be credible. The testimony was largely consistent among the three officers. More importantly, their testimony was corroborated by the video evidence as well as the audio and transcripts. For example, the POD camera showed Officers Medina and Allen patrolling the area shortly before shots were fired. Then, at the time the shots were fired, the individuals seen in the frame of the video recording fled in apparent fear, providing strong evidence that gunshots were indeed fired. Shortly thereafter, Officers Medina and Allen's car appears in the frame and heads in the direction of where they testified that they received the anonymous tip. Furthermore, the available dashboard camera video corroborates the officers' description of events once the white Cadillac eventually did pull over.

Notably, Watson's own testimony is also largely consistent with the officers' testimony. His testimony diverges from the officers' testimony only with respect to whether the white Cadillac pulled over immediately upon the activation of the lights and siren, and whether Watson was making pushing and pulling movements in the backseat. As to those issues, the Court again credits Officer Medina's and Officer Allen's testimony. The dashboard camera and audio, along

with the transcript, support the officers' testimony as to the Cadillac's failure to yield immediately. About 45 seconds elapsed between the time that Officer Allen reported the white Cadillac's license plate number and when Officer Medina announced they were at 68th and Anthony—the location where the car finally stopped. That time gap is consistent with a pursuit spanning the distance to which the officers testified. Moreover, the Court has viewed photographs of the white Cadillac and observed its tinted windows. (Gov. Ex. Photographs 1–5.) The Court therefore credits the officers' testimony that they could see into the car, as the tint was not so dark as to obscure completely an outsider's view into the interior.

As to whether the evidence supports that Officers Medina and Allen had reasonable suspicion for the vehicle stop, the Court first finds that the totality of the circumstances known to the officers prior to the stop included more than just a single anonymous tip. Rather, the officers had personally heard the gunshots and were able to trace them to the area around 71st and Rhodes. Moreover, Officer Medina testified that as she and Officer Allen drove to the area, she heard dispatch report 911 calls that also confirmed shots fired in that area. *See United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006) ("We . . . presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion . . . ."). Thus, there was ample evidence that gunshots had been fired and therefore "criminal activity may [have been] afoot." *See Terry*, 392 U.S. at 30. The anonymous tipster simply provided additional information regarding the source of the gunshots.

Moreover, the events occurring after the officers had located the white Cadillac further bolstered their reasonable suspicion. Officers Medina and Allen testified that the white Cadillac continued driving after the officers activated their lights and siren. Such evasive behavior is a factor that can support reasonable suspicion. *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir.

2010); *United States v. Lawshea*, 461 F.3d 857, 860 (7th Cir. 2006) ("[W]e have made it clear that when a suspect attempts to flee from the police, the officers have reasonable suspicion to pursue the suspect in order to conduct a *Terry* stop."). Officers Medina and Allen also testified that after activating their lights and siren, they could see the backseat passenger "busy at work with the rear-seat" as if attempting to hide something. Such suspicious behavior also supports reasonable suspicion. *See United States v. Hendricks*, 319 F.3d 993, 1003 (7th Cir. 2003) (finding that an officer's observation of a suspect's suspicious behavior is a factor that supports a finding of reasonable suspicion). In addition, the failure to yield taken together with the rear-seat passenger's suspicious behavior further strengthens the claim of reasonable suspicion. *See Lawshea*, 461 F.3d at 859 ("[W]e recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play."). Indeed, while the facts suggest that the white Cadillac was not overtly trying to flee, as it was not speeding or running red lights, when viewed in conjunction with the rear-seat passenger's activity, it would be reasonable for the officers to conclude that the driver was attempting to buy time for his passenger to conceal incriminating evidence.

But even if the officers were solely relying on the anonymous tip, reasonable suspicion would still exist. While "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," it is not the case that such a tip can never supply reasonable suspicion justifying an investigatory stop. *Alabama v. White*, 496 U.S. 325, 329 (1990). Rather, "under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *Navarette*, 134 S. Ct. at 1688 (quoting *White*, 496 U.S. at 327) (alteration omitted).

The tip here shares characteristics with other anonymous tips that courts have found to be reliable. First, the unidentified man flagged down the officers in the area where the gunshots were believed to have occurred, and he was able to supply the make and model of the car from which the gunshots were fired, along with the detail that it had a white grill and was occupied by two males. Firsthand eyewitness knowledge and the ability of the eyewitness to recount specific details of the vehicle engaged in wrongdoing supports the tip's reliability. *Navarette*, 134 S. Ct. at 1689. And the fact that the tipster conveyed the information shortly after the gunshots were fired makes the tip the "sort of contemporaneous report that has long been treated as especially reliable." *Id.* at 1689. Then, just minutes after they first heard the gunshots, the officers were able to locate a vehicle matching the tipster's description near the area where the shots were fired and travelling in the direction that the tipster pointed them, which corroborated the tip. *See United States v. Winbush*, 337 F.3d 947, 950 (7th Cir. 2003) (finding that an officer was justified in stopping a vehicle based on a general dispatch report when a vehicle matching dispatch's description was located just eight blocks away from a shooting that occurred minutes earlier).

In sum, the totality of the circumstances was sufficient to give Officers Medina and Allen reasonable suspicion that the white Cadillac was involved in criminal activity. Those circumstances included an anonymous but reliable tip, the officers' own personal observations, 911 calls reporting gunshots, and the suspicious and evasive behavior of the passengers in the white Cadillac. Consequently, the guns and shell casing cannot be suppressed on the grounds that they were fruits of an unlawful traffic stop.

### II. Watson's Arrest

As an alternative basis for suppression, Watson argues that he was subjected to an unlawful arrest. As the search of the white Cadillac was permitted in connection with the valid

*Terry* stop and the automobile exception to the warrant requirement, the purported illegality of Watson's arrest would seem to be of no moment with respect to the fruits of that search. In any case, the Court disagrees with Watson's assertion that he was subjected to an unlawful arrest.

As an initial matter, when law enforcement officers undertake a search without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). It is the Government's burden to "show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). Here, the Government claims that the officers searched the white Cadillac as part of an investigatory stop pursuant to *United States v. Terry*, 392 U.S. 1 (1968). Such an investigatory stop is "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). During an investigatory stop of an automobile, officers may conduct a protective search of the vehicle's passenger compartment when they have a reasonable belief that the vehicle's occupants pose a danger to the officers' safety due to the possible presence of weapons in the vehicle. *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003). Here, Officer Medina had good reason to conduct a protective sweep, as she suspected that Watson and Withers were just involved in a shooting. Her search did not exceed the scope of what is allowable under *Terry*, as she limited her initial search to the backseat of the vehicle until she saw the butt of a handgun, which, although hidden in the trunk, was plainly visible through an opening in the armrest.

Once Officer Medina observed the handgun, the officers expanded their search of the white Cadillac to the trunk. *See id.* at 750–51 (finding that officers engaged in an investigatory

stop had probable cause to further search the vehicle upon observing an open container of alcohol and smelling marijuana). This expanded search would fall under the automobile exception to the Fourth Amendment's warrant requirement, which allows for the warrantless search of an automobile when a law enforcement officer "has probable cause to believe that the vehicle contains evidence of criminal activity." *United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017). However, the Court need not decide this issue because Watson, as a passenger lacking a possessory interest in the searched vehicle, has no standing to challenge the search under the automobile exception. *See Rakas v. Illinois*, 439 U.S. 128 148–49 (1978). Watson appears to concede this fact.

Indeed, with his unlawful arrest argument, Watson is likely attempting to circumvent his standing problem by arguing that what the Government refers to as a *Terry* stop had ripened into a *de facto* arrest. Under that view, the resulting search would not have been a protective search but instead would fall under the search-incident-to-arrest exception to the Fourth Amendment. Under that exception, an officer may undertake a warrantless search of a vehicle "incident to a recent occupant's arrest . . . if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). The automobile exception and the search-incident-to-arrest exception "are interrelated, but not identical." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). The Court is not aware of controlling precedent[5] holding that a passenger lacking a possessory interest in a vehicle has standing to challenge a search of that

---

[5] The Tenth Circuit has stated that a passenger without a possessory interest in a searched vehicle may nonetheless suppress evidence when it is derived from the passenger's unlawful arrest. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995).

15

vehicle incident to the passenger's arrest. But that standing issue only needs to be reached if Watson was in fact under arrest prior to the commencement of the officers' search of the vehicle.

The general rule is that "a warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). While he is never fully clear on this point, Watson seems to contend that he was under arrest immediately upon being removed from the car and handcuffed. The Government, however, does not assert that the officers had put Watson under arrest at that point in time. To the contrary, the Government contends that Watson was not yet under arrest and does not rely on the search-incident-to-arrest exception as the basis for its search. Instead, the Government claims that probable cause arose— and Watson was under arrest—only after the discovery of the guns and shell casing.

The Government contends that, from the time the white Cadillac was pulled over until the discovery of the handguns and shell casing in the trunk, the officers were only engaged in an investigatory stop. As discussed above, such a stop need only be supported by reasonable suspicion. However, an investigatory stop might exceed constitutional bounds if it is not "reasonably related in scope and duration to the circumstances that justified the stop in the first instance." *Huff v. Reichert*, 744 F.3d 999, 1006 (7th Cir. 2014) (internal quotation marks omitted). When the stop "continues too long or becomes unreasonably intrusive," it will "ripen into a de facto arrest that must be based on probable cause." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011).

In determining whether an investigatory stop has transformed into an arrest, the key issue is "whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *Vega*, 72 F.3d at 515. Reasonableness is evaluated using a "sliding

scale approach." *Bullock*, 632 F.3d at 1015. Officers undertaking an investigatory stop have a great degree of latitude in the techniques they use to "neutralize potentially dangerous suspects during an investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). Thus, in certain circumstances, officers are permitted to use "measures of force more traditionally associated with arrest," such as handcuffing suspects, placing them in police cruisers, or even drawing their weapons. *Id.* at 1224–25. Ultimately, an investigatory stop will be deemed reasonable—and thus not an arrest—"when the degree of suspicion is adequate in light of the degree and duration of the restraint." *United States v. Chaidez*, 919 F.2d 1193, 1198 (7th Cir. 1990).

Based on the circumstances here, the Court cannot conclude that Watson was under arrest immediately upon his removal from the vehicle. First, there is no debate that during an investigatory stop of a vehicle law enforcement may order both the driver and any passengers out of the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). Moreover, the officers initiated the investigatory stop because they had reason to believe that the one or both of the individuals in the vehicle were armed and indeed had just used their weapons minutes before. Officer Allen also recognized one of the vehicle's occupants as affiliated with a violent gang. Thus, it was reasonable for the officers to take more intrusive measures than they would in less dangerous situations. Here, the officers approached the car with their weapons drawn, then handcuffed Watson, and moved him off to the side. Such measures have been approved by courts previously, *Tilmon*, 19 F.3d at 1224–25, and were not unreasonable here given the officer's reasonable evaluation of the potential danger presented by the occupants of the vehicle. Finally, Watson was detained prior to his arrest no longer than necessary for the officers to search the vehicle for weapons. *See Bullock*, 632 F.3d at 1015 ("When determining the reasonableness of the length of

detention, the court should consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation."). Given the circumstances facing the officers, the degree of intrusion did not exceed the bounds of reasonableness such that Watson was effectively under arrest immediately upon his removal from the white Cadillac.

Since Watson was not under arrest at the time he was removed from the vehicle, he cannot move to suppress the firearms and the shell casing as derived from a search following an unlawful arrest. Thus, this Court need not reach the issue of whether he has standing to challenge the search of the white Cadillac incident to his arrest.

In addition, the officers had probable cause to arrest Watson once they found the firearms. The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000). Here, the officers heard shots fired. Then, when they arrived at the area from where they heard the shots coming, they received a tip from a man identifying the shots as coming from a white Cadillac. Shortly thereafter, Officers Allen and Medina came upon a vehicle matching that description in the direction in which the tipster pointed. Furthermore, once the officers activated their siren, the white Cadillac failed to yield. While they followed the car, Officers Medina and Allen observed the backseat passenger pushing and pulling on the backseat. Once the car did pull over, they found Watson in the backseat. And right around the area where the backseat passenger was making the suspicious movements, they observed the butt of a handgun through an opening in the armrest. Following the search of the

trunk and the discovery of the firearms and shell casing, the totality of the circumstances gave the officers reason to believe that Watson was hiding the guns. Thus, there was probable cause to arrest Watson at this point.

The evidence demonstrates that there was no unlawful arrest here. At the time Watson was removed from the vehicle, he was not yet under arrest. Then, upon the officers' discovery of the firearms and shell casing, there arose probable cause to arrest him. To the extent Watson contends that evidence obtained from the search of the white Cadillac must be suppressed due to an illegal, warrantless arrest, he is mistaken.

## CONCLUSION

For the foregoing reasons, Watson's motion to suppress is denied.

ENTERED:

Dated: August 31, 2018

_____
Andrea R. Wood
United States District Judge